## THE PUTNAM (two cases).

(Circuit Court of Appeals, Second Circuit. March 1, 1926.)

### Nos. 244, 245.

**1. Collision ⊜⟹98—Steamer, failing to govern herself in accordance with port to port passage agreed on, is liable for damages (article 18, rule 1 [Comp. St. § 7857]).**

Under article 18, rule 1 (Comp. St. § 7857), after whistle of one blast, requiring port to port passage, failure of steamer to govern itself accordingly renders her responsible for damage resulting therefrom.

**2. Collision ⊜⟹98—Signal given for port to port passage, when vessels came in sight of each other, answered by other vessel, is controlling, notwithstanding different signal was blown while vessel was around bend, and only smoke was visible.**

Where first whistle blown when vessels came in sight of each other, signaling port to port passage, was answered by other steamer, there was no duty to depart from statutory rule requiring such passage, notwithstanding two-whistle signal had been given from vessel around the bend, when only smoke was visible.

**3. Collision ⊜⟹98—Tug signaling for port to port passage, when meeting steamer coming around bend, and stopping her engine immediately on discovering steamer was not governing herself accordingly, cannot be held liable for failure to stop engines in time.**

Where tugboat, after coming around bend, had signaled for port to port passage, and had stopped her engines immediately on discovering that steamer was not governing herself accordingly, tug cannot be *held* liable on theory that she did not stop her engines in time.

**4. Collision ⊜⟹95(1)—Tug cannot be held at fault for attempting to push steamer's tow, so as to avoid collision, after having been placed in pocket because of steamer's failure to act according to passage agreed on.**

Where tug, after signaling for port to port passage, discovered that tow of steamer had pocketed her in canal, and in attempt to avoid collision tried to push tow of steamer, so as to avoid contact with her own tow, she cannot be held at fault for damage caused, where line parted and float being towed by steamer collided with tug's tow.

Appeals from the District Court of the United States for the Eastern District of New York.

Libel by the Murray Transportation Company against the steamer Putnam and the steam tug Oceland No. 3 for damages to libelant's barge; also libel by the Ocean & Inland Transportation Company, Inc., as owner of the Oceland No. 3 against the steamer Putnam for damages to it. Decree against the steamer Putnam and the tug Oceland No. 3 for damages sustained by the Murray Transportation Company as owner of a barge. Decree and libel filed by the Ocean & Inland Transportation Company, Inc., was dismissed. Libelant last named and the steam tug Oceland No. 3 appeals. Reversed, with directions.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers, of New York City, of counsel), for appellant.

Foley & Martin, of New York City, for libelant-appellee.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson, of New York City, of counsel), for appellee New York Canal & Great Lakes Corporation.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The steamer Putnam, 150 feet long, 22 feet beam, was used for carrying cargo and towing boats on the canal. On the morning of October 30, 1922, she was a short distance above Eagle Harbor, on the Erie Barge Canal, towing five barges which were light and one which was loaded. The loaded barge was towed alongside on the starboard side of the steamer. The five light boats were astern, made up of one ahead, with two tiers, of two boats each, following. The Oceland No. 3, a tugboat, had five loaded barges in tow. The tow was made up in two sections, tandem formation, two in the first, and three in the second. The hawser to the head section was about 400 feet in length, and the intermediate hawser to the other section 300 feet in length. With fair weather, wind north, and very light, and the Oceland No. 3 going with the current, the tows approached each other head on head; the Putnam bound for Buffalo, and the Oceland No. 3 bound for New York. When the Oceland No. 3 approached the bend from the westward, those on board observed smoke beyond the point coming from the Putnam, and she blew a bend whistle. This was not answered by the Putnam. Shortly after the Oceland No. 3 sounded her bend whistle, the Murray came in view from beyond the bend. The Oceland No. 3 then blew a whistle signal of one blast, which the Putnam answered with a whistle of one blast, thus agreeing to a port to port passage. At this time, the Putnam, approaching on her starboard side, was visible to the Oceland No. 3.

We cannot find, as found by the trial judge, that the Putnam sounded a two-whistle signal in reply to the one-whistle signal. The master of the Putnam testified that he

sounded a two-whistle signal when he saw over the land, across the bend, the smoke of the approaching Oceland No. 3, and that at that time he could not see the Oceland No. 3. He then said that, when the Oceland No. 3 came into sight, the Oceland No. 3 blew one whistle and he answered with one. As the two vessels approached each other, the Putnam was not navigating in accordance with the agreement, and the Oceland No. 3 sounded the alarm and slowed down. When the hawser of the Putnam came in view of the Oceland No. 3, the Putnam's tow was angling across the canal, and the tail of it was within 10 or 15 feet of the bank of the canal. That was on the starboard side of the Oceland No. 3, and the Oceland No. 3 was thus placed in a pocket. When the Oceland No. 3 slowed and blew a whistle signal of three short blasts, which indicated that the Putnam should slow down, the signal was answered by the Putnam with a like signal of three short blasts and the Putnam slowed. The Putnam and the Oceland No. 3 passed port to port about 10 feet distant from each other, and the Oceland No. 3 came to a dead stop to avoid colliding with the port boat on the second tier of the Putnam's tow. As the forward corner of the Putnam's port boat in the second tier of the tow passed the bow of the Oceland No. 3, the Oceland No. 3 went ahead under a hard-astarboard helm and endeavored to push the light tow of the Putnam toward the northerly bank of the canal, so that the tow of the Oceland No. 3, which was drifting down with the current, might pass the tow of the Putnam in safety.

While engaged in this maneuvering, and while the bow of the Oceland No. 3 was against the port side and amidships of the port-side boat of the second tier of the Putnam's tow, the propeller of the Oceland No. 3 fouled the southerly bank of the canal, causing her to be stranded and resulting in the damages for which she has filed a libel. A line was put from the Oceland No. 3 to the Saunders A. Wertheim, the port boat of the second tow of the Putnam, to hold the bow of the Oceland No. 3 in place against the side of the Putnam's bow, while the Oceland No. 3 was pushing, in an endeavor to push the Putnam's tow over toward its own side of the channel. The line parted, and the tow of the Putnam continued on, and collided with the tow of the Oceland No. 3, which was drifting down with the canal current, causing damages which resulted in the damage for which the Murray Transportation Company, as owner of the Wertheim, sues.

[1-3] Under the circumstances under which the vessels met, article 18, rule 1 (Comp. St. § 7857), was applicable, requiring a port to port passage, and the failure of the Putnam to govern herself accordingly renders her responsible. The signals exchanged indicated an intention to adhere to this rule, but the Putnam was sagging across the canal, and pocketed the Oceland No. 3. It was not the duty of the Oceland No. 3, as found below, under the circumstances, to have responded to the Putnam by a two-whistle signal, which would agree to a starboard to starboard passage. According to the record, there was no such two-whistle signal given after the vessels came in sight of each other, and there was no duty on the part of the Oceland No. 3, if a two-whistle signal was given from a vessel around a bend, when only smoke was visible, to depart from the statutory rule. The record is clear that, when the vessels came in sight of each other, the first whistle blown by the Oceland No. 3 was a signal for a port to port passage, and this was immediately answered by the Putnam, which was intended as its assent to such passage. Nor may liability be imposed upon the Oceland No. 3 upon the theory that she did not stop her engines in time. The Oceland No. 3 was stopped entirely at the time she came to the bow of the Murray, and thus drifted alongside the Wertheim.

The surface of the channel between the banks at this point is estimated to be about 90 or 100 feet, and the channel shelves down to the bottom, with a width of 65 feet and a depth of 9 feet 6 inches. Before the collision, the Putnam had placed her loaded barge astern of the hawser. The master of the Putnam says the barge did not handle properly in that way, and it took her alongside of the Putnam on the starboard side. The Putnam was about 22 feet 6 inches in width, and the loaded barge alongside her was about 23 feet. Astern of the Putnam, on a bridle hawser, was the rest of the tow, as above indicated. This made passing difficult. It required the Putnam to have regard for the Oceland No. 3 passing, and to keep well over to her side of the canal. It would have been more practical to have the loaded boat on the port side of the Putnam, instead of the starboard side, for being on the starboard side prevented the Putnam from getting over to the starboard side of the canal, where she would have to go in or-

der to take her tow clear of other vessels going in the opposite direction. Made up as she was, she could not make any effort to get her tow to her own starboard side of the channel, because, with a loaded boat alongside and only 9 feet 6 inches of water for a depth of 65 feet in the canal, the Putnam, instead of being able to go practically up against the starboard bank of the canal, would have to remain in about the middle of the deep water, or put the loaded boat on her starboard side aground.

[4] The court below held the Oceland No. 3 at fault in connection with the attempt to push the tow of the Putnam. The Oceland No. 3 and her tow were drifting with the current down into the pocket formed by the starboard side of the canal and the tow of the Putnam, which was angling over toward the Oceland No. 3's side of the canal and within 10 feet. The steamer Putnam was going ahead slowly, with the result that the Oceland No. 3 and her tow were bound to come in contact with the boats of the Putnam's tow, thus tailing across the canal, unless the Oceland No. 3 could do something to prevent it. It was plainly the obvious thing to do, to engage in a maneuver which would have the practical effect of pushing over the Putnam's tow to its proper side of the canal. The maneuver was partially successful, and perhaps prevented a more serious disaster. She made a change of about two points in her heading to her own port, in order to push against the side of the boat in the Putnam's tow, and in order to prevent her stem from slipping along the side, so that she would get no result in removing the Putnam's tow off to the Putnam's own starboard. She caused a line to be put out to the Putnam's tow, to hold her own stem in place. The lines parted, and at the same time the Oceland No. 3 touched the starboard side of the shelving canal bottom. This emergency was one which fittingly called for such an effort to avoid collision, and we are not willing that, because one of the consequences of its effort was the breaking of a line, to impose liability on the Oceland No. 3.

The decrees below will be reversed. A decree may be entered against the Putnam alone for the relief sought by the Murray Transportation Company, and a decree may be entered in the second libel for full damages sustained by the Oceland No. 3 against the Putnam, both with costs.